# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

─────────────────────────────────────────────────────────

MARC GOODELL,
PHILIP POWERS,
CHAD WERTH,
ROSS BLAKLEY,
DOMINICK P. TUCKER,
JUSTIN ROSE, and
KYLE CRAWFORD,
on behalf of themselves and a class
of employees and/or former employees
similarly situated,

        Plaintiffs,

    v.                                       Case No. 08-cv-512-C

CHARTER COMMUNICATIONS, LLC,
and
CHARTER COMMUNICATIONS, INC.

        Defendants.

─────────────────────────────────────────────────────────

## MEMORANDUM OF LAW IN SUPPORT OF PETITION
## FOR CLASS COUNSEL'S COSTS AND ATTORNEYS' FEES

─────────────────────────────────────────────────────────

Plaintiffs, Marc Goodell, Philip Powers, Chad Werth, Ross Blakley, Dominick P. Tucker, Justin Rose, and Kyle Crawford, by and through their attorneys, Gingras, Cates & Luebke, S.C. and Axley Brynelson, LLP, petition the Court for an award of attorneys' fees and costs in the above-captioned matter. Plaintiffs' petition is based on Rule 23(h)(1), Fed. R. Civ. P., the attached affidavits of Attorneys Robert C. Gingras, Michael J. Modl, Aaron N. Halstead, William E. Parsons, Michael R. Fox and Jay A. Urban, and the following grounds.

## INTRODUCTION

This is a Rule 23 class action alleging violations of the wage and hour laws of nine separate states,[1] and a collective action under the Fair Labor Standards Act, brought on behalf of a class similarly situated technicians employed by Defendants Charter Communications, LLC, and Charter Communications, Inc. ("Charter").  After more than 18 months of litigation and prolonged mediation, the parties have reached a settlement of all claims on behalf of approximately 3,650 current and former technical employees.

The result in this case is exceptional, particularly in light of the significant risks that Class Counsel assumed in litigating this matter.  The settlement puts approximately $12.5 million in cash into the hands of class members.  The average cash payout per class member, prior to applicable withholding, is nearly $3,500.

Class Counsel assumed a significant risk in prosecuting this matter.  Class Counsel accepted this case on a 30% contingency fee basis, bearing the entire risk in the event that there was no recovery.  The risk of non-recovery in this case was particularly acute because, prior to filing, Class Counsel was aware that Charter was potentially insolvent and at risk of bankruptcy.  These concerns became a reality in March of 2009 when Charter filed a Chapter 11 bankruptcy petition, a turn of events that necessitated costly and time-consuming efforts by Class Counsel to protect the interests of class members in the bankruptcy proceeding.

---

[1]    Plaintiffs' Third Amended Complaint includes claims under California, Michigan, Minnesota, Missouri, Nevada, Illinois, Nebraska, Oregon and Washington wage and hour law.

Class Counsel have invested more than 4,800 hours of time into this litigation. Class Counsel agreed to be responsible for all costs in the event of an adverse result.  The costs in this matter are approximately $122,000, but would have been significantly greater had the case proceeded through Rule 23 certification, discovery, dispositive motions, and trial.  There were also significant risks in this litigation based upon defenses that Charter asserted, including the Employee Commuting Flexibility Act and the Motor Carrier Act.

In light of the exceptional result obtained by Class Counsel on behalf of the class members and the significant risks involved, Plaintiffs petition for recovery of their costs and attorneys' fees incurred in this matter in the amount of $5,400,000.00, or 30% of the common settlement fund of $18 million.  A contingency fee of 30% is consistent with the percentage permitted in other common fund settlements, is consistent with market rates, and recognizes the exceptional result obtained and the significant risks assumed by Class Counsel in litigating this matter.  Accordingly, Class Counsel respectfully requests that this Court enter an award of $5,400,000 for their reasonable costs and attorneys' fees.

## STATEMENT OF FACTS

On August 28, 2008, Plaintiff Marc Goodell filed this lawsuit on behalf of himself and similarly situated current and former Charter technicians working in "covered positions," seeking unpaid wages and overtime compensation under the wage and hour laws of twenty-nine (29) states.  (Dckt. #1).  On October 31, 2008, Plaintiff filed an Amended Complaint, outlining substantially the same allegations as the original complaint, but reducing the number of states to eighteen (18).  (Dckt. #5).  On January 7, 2009, Plaintiffs filed a Second Amended Complaint, adding Philip Powers, Chad Werth,

Ross Blakley, and Dominick P. Tucker as Plaintiffs, and further reducing the number of states' laws at issue to four (4).  (Dckt. #27).  Plaintiffs have since filed their Third Amended Complaint, which is the controlling complaint for purposes of settlement.  The Third Amended Complaint adds Justin Rose and Kyle Crawford as Plaintiffs, and includes wage and hour claims under the laws of California, Michigan, Minnesota, Missouri, Nevada, Illinois, Nebraska, Oregon and Washington.

Each of the Plaintiffs, on behalf of himself and the putative class members, has executed a fee agreement retaining Gingras, Cates & Luebke and Axley Brynelson, LLP as Class Counsel.  (Modl Dec., ¶ 6); (Gingras Dec., ¶¶ 5-7).  Attorneys Robert Gingras and Michael Modl served as co-lead Counsel on behalf of the Plaintiff classes in this matter.  (Modl Dec., ¶ 13); (Gingras Dec., ¶ 4).  Attorneys Gingras and Modl supervised the efforts of other attorneys and legal professionals at their respective offices.  (Modl Dec., ¶ 16); (Gingras Dec., ¶ 10).  Attorney John Mitby oversaw a number of critical issues in the case, including mediation, settlement discussions and overall strategy. (Modl Dec., ¶ 14).

Pursuant to the fee agreements, Class Counsel agreed to assume the risk for all actual costs in the litigation in the event Plaintiffs were unsuccessful.  (Modl Dec., ¶ 9); (Gingras Dec., ¶ 11).  In light of this risk, and the massive undertaking implicit in this class action lawsuit, Plaintiffs agreed to a payment of either 30% of 33.3% of the gross recovery if this matter was resolved through settlement.[2]  (Modl Dec., ¶¶ 7-8); (Gingras

---

[2]     Plaintiffs Marc Goodell, Philip Powers, Chad Werth, Ross Blakley, and Dominick P. Tucker executed fee agreements under which Class Counsel is entitled to 30% of the settlement amount.

Dec., ¶ 7).  Here, Class Counsel requests a combined fees and costs award of 30% of the common settlement fund.  Under the terms of the fee agreements, Class Counsel are entitled to attorneys' fees in the amount of 30% *plus actual costs*.  (Modl Dec., ¶ 10). Instead of requesting a separate award of actual costs, however, Class Counsel ask that their costs be absorbed into the combined 30% fees and costs request.  (Modl Dec., ¶ 11); (Gingras Dec., ¶ 19).  In other words, Class Counsel have not requested a separate award of costs such that Class Counsel's combined request of fees and costs will exceed 30% of the common settlement fund.  This approach actually decreases Class Counsel's fee attorneys' fees request to approximately 29.3% of the common fund.  (Modl Dec., ¶ 12); (Gingras Dec., ¶ 19).

As part of their fee petition, Class Counsel have submitted declarations from attorneys in the community who regularly litigate wage-and-hour cases in Wisconsin and are familiar with market rate for attorneys' fees awards in such cases.  These practitioners have testified that a 30% award of attorneys' fees and costs is consistent with the appropriate market rate for similar FLSA actions in the Western District of Wisconsin. (Parsons Dec. ¶ 14); (Halstead Dec. ¶ 11); (Urban Dec. ¶ 6).  These practitioners have also testified that Charter's bankruptcy risk significantly increased the risk of non-payment that Class Counsel faced at the outset of this litigation.  (Urban Dec. ¶ 5); (Parsons Dec. ¶ 15).  Attorney Parsons, for example, views Charter's bankruptcy risk as a

---

(Modl Dec., ¶ 7); (Gingras Dec., ¶ 7).  Plaintiffs Justin Rose and Kyle Crawford executed fee agreements that call for Class Counsel to receive 33.3% of the settlement amount.  (Modl Dec., ¶ 8); (Gingras Dec., ¶ 7).

factor which "would have strongly weighed against [his] willingness to accept or pursue a case like this on a contingent fee of any less than 30%." (Parsons Dec. ¶ 15).

As early as July of 2008, Class Counsel was aware that Charter posed a significant bankruptcy risk. (Modl Dec., ¶ 17); (Gingras Dec., ¶ 14). For this reason, Class Counsel insisted that Charter provide a letter of credit as a condition of settling a related class action against Charter, Sjoblom v. Charter Communications, LLC, et al. (W.D. Wis. Case No. 3:07-cv-00451-bbc). (Modl Dec., ¶ 18). The purpose of the letter of credit was to ensure that settlement proceeds in the Sjoblom matter would be funded by JP Morgan Chase Bank, N.A., a third-party creditor, if Charter filed a bankruptcy petition. (Modl Dec., ¶ 19). Class Counsel believed that a letter of credit was necessary after reading a series of articles in media sources which described Charter's deteriorating financial condition. (Modl Dec., ¶ 20); (Gingras Dec., ¶ 14).

On March 27, 2009, Charter filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York. (Modl Dec., ¶ 21). Throughout Charter's bankruptcy, Class Counsel continued to aggressively represent the interests of Plaintiffs and the putative classes. (Modl Dec., ¶ 22); (Gingras Dec., ¶ 16). Most notably, on May 28, 2009, Class Counsel filed a Motion for Class Certification and For Class Treatment of Plaintiffs' Proof of Claim, as well as a Motion for Estimation of Plaintiffs' Class Claim. (Modl Dec., ¶ 22). By filing these motions, Class Counsel requested that the bankruptcy court certify the Plaintiff classes pursuant to Rule 7023 of the Federal Rules of Bankruptcy Procedure, and to estimate the value of Plaintiffs' class claims. (Id. ¶ 23). The purpose of these motions was to protect the class members if their claims were liquidated under Charter's reorganization plan. (Id. ¶ 24).

On June 2, 2009, the bankruptcy court held a telephonic hearing at the request of Charter's bankruptcy counsel to address Plaintiffs' class certification and estimation motions.  (Id. ¶ 25).  During the hearing, Charter's bankruptcy counsel argued that the bankruptcy court should not certify the Plaintiff classes because their claims would pass through the bankruptcy and be litigated in the present forum following the confirmation of Charter's plan of reorganization.  (Id. ¶ 26).  The bankruptcy court then asked the parties to negotiate and execute a stipulation permitting Plaintiffs to pursue their claims in the United States District Court for the Western District of Wisconsin following confirmation.  (Id. ¶ 27).  The bankruptcy court entered the stipulated order in late June, 2009.  (Id. ¶ 28).  On November 17, 2009, the bankruptcy court confirmed Charter's Chapter 11 plan of organization.  (Id. ¶ 29).

In September of 2009, while Charter's bankruptcy case was still pending, the parties retained Professor Eric D. Green to mediate this case.  (Green Dec., ¶ 7).  Professor Green has worked as a professional mediator for more than thirty years, and is the principal of Resolutions, LLC, a mediation, arbitration and ADR firm in Boston, Massachusetts.  (Id. at ¶ 1).  Professor Green has successfully mediated many complex, large-scale cases, including the United States v. Microsoft anti-trust case, as well as numerous class-action cases.  (Id. at ¶ 4).

On December 8-9, 2009, the parties met in Boston for an initial two-day mediation session with Professor Green.  (Id. ¶ 8); (Modl Dec., ¶ 30); (Gingras Dec., ¶ 17).  While the parties did not reach a settlement in Boston, they continued their settlement efforts through numerous telephonic discussions with Professor Green from late December, 2009 through March, 2010.  (Green Dec., ¶ 8).  On March 16, 2010, the

parties met for a second, lengthy mediation session in Utah. (Id. ¶ 9). At the conclusion of this session, Class Counsel and counsel for Charter executed a Memorandum of Understanding memorializing the basic terms of this settlement. (Id.); (Modl Dec. ¶ 31).

The settlement efforts in this case were protracted, highly contested, and entirely at arm's-length. (Green Dec. ¶¶ 11-12). The settlement reflects the result of an extensive analysis, through mediation, of both the merits of Plaintiffs' claims and the strength of Charter's substantive defenses. (*See* Id. ¶¶ 11-12). After the parties executed the Memorandum of Understanding, they engaged in extensive negotiations regarding the terms of the settlement agreement and continued to negotiate unresolved issues bearing upon settlement. (Modl Dec., ¶ 32). The parties have continued these efforts through the date of this submission.

### A.     Work Performed By Class Counsel.

Class Counsel and legal professionals associated with Class Counsel have devoted more than 4,800 hours on behalf of the Plaintiff classes and have incurred approximately $122,000 in actual costs. (Modl Dec., ¶¶ 15, 33); (Gingras Dec., ¶¶ 9, 12). Class Counsel reasonably anticipates that it will incur an additional $3,000 in costs administering the settlement and addressing class members' questions regarding the settlement. (Modl Dec., ¶ 33). Class Counsel has retained a third-party claims administrator, Rust Consulting, Inc. ("Rust"), to help administer the settlement. (Id.). Rust's services will cost $90,000, half of which, $45,000, will be deducted from the common fund. (Id.).

Class Counsel's legal services have included detailed investigations of potential claims against Charter. This has included in-person and telephonic conferences with

Plaintiffs and numerous putative class members.  (Modl Dec., ¶ 34).  The putative class includes approximately 3,650 individuals from nine states.  Class Counsel contacted numerous class members to investigate the issues in the case, including non-payment for loading and unloading and the time spent working off-the-clock and during scheduled lunch breaks.  (Id. ¶ 35).  Class Counsel engaged in numerous phone interviews with putative class members and traveled to meetings with class members.  (Id. ¶ 36).  Class Counsel prepared the original Complaint as well as the First, Second, and Third Amended Complaints in this matter.

Class Counsel also spent substantial time and effort researching and responding to motions filed by Charter.  These included a Motion to Transfer to the Eastern District of Michigan (Dckt. #10), as well as a second Motion to Transfer, which included a request that the Court sever Plaintiffs' claims into four separate actions.  (Dckt. #41).[3]

Class Counsel also spent significant time and resources proving that the Plaintiff classes were suitable for class certification.  Specifically, Class Counsel conducted extensive telephone interviews with dozens of class members to determine the amount of time that they spent engaged in the uncompensated work activities that were at issue in this case.  (Modl Dec. at ¶ 38).  The results of this survey were shared with Class Counsel's class-certification expert, Dr. David Lewin.  (Id. ¶ 39).  Dr. Lewin then utilized this data in an expert report which accompanied Plaintiffs' Motion for Class Certification and For Class Treatment of Plaintiffs' Proof of Claim, and Motion for Estimation of

---

[3]    Charter's Second Motion to Transfer is still pending, and Plaintiffs have not filed their response. Nonetheless, Plaintiffs have spent many hours preparing the response, which is ready for filing.

Plaintiffs' Class Claim.  (Id. ¶ 40).  Dr. Lewin's report concluded that class certification was appropriate due to Charter's highly centralized management structure and the standardization of its payroll practices.  (Id. ¶ 41).  Dr. Lewin also estimated the amount of damages due to Plaintiffs.  (Id. ¶ 42).  Dr. Lewin's report served as a central component of Plaintiffs' submissions to the bankruptcy court.  If this case had proceeded to briefing on the merits of class certification, Class Counsel would have relied upon an updated version of Dr. Lewin's report to establish the prerequisites for certification.  (Id. ¶ 43).  Plaintiffs incurred more than $50,000 in costs in retaining Dr. Lewin's services. (Id. ¶ 44).

Class Counsel performed significant work to protect the interests of class members during Charter's bankruptcy.  In addition to drafting the certification and estimation motions described above, Class Counsel attended two hearings at the United States Bankruptcy Court for the Southern District of New York which concerned the treatment of creditors' claims.  (Id. ¶ 45).  Class Counsel also drafted an objection to Charter's bankruptcy disclosure statement.  (Id. ¶ 46).  Class Counsel regularly reviewed bankruptcy filings to determine their impact on the class members' claims, and engaged in numerous telephonic conferences with Charter's bankruptcy counsel regarding the treatment of class members' claims.  (Id. ¶ 47).

Class Counsel also devoted time and effort related to written discovery in this matter, preparing an extensive set of discovery requests in November, 2008.  (Id. ¶ 48). Class Counsel spent many hours engaged in meet-and-confer sessions with counsel for Charter regarding the scope of Charter's discovery obligations.  (Id. ¶ 49).  Class Counsel

also consulted with Plaintiffs' E-discovery expert on numerous occasions regarding efforts to obtain E-discovery from Charter.  (Id. ¶ 50).

Through the duration of this case, Class Counsel met on nearly a weekly basis. (Id. ¶ 51).  Class Counsel discussed the status of pending matters and analyzed strategies to move the case forward.  (Id. ¶ 52).  Lead counsel delegated appropriate tasks to the various team members.  (Id. ¶ 53).  With the magnitude of this litigation, it was imperative that there be regular communication between everyone on Class Counsel's litigation team.  (Id. ¶ 54).

Class Counsel's efforts also involved significant research into the state wage-and-hour laws at issue in this litigation.  (Id. ¶ 55).  In addition, Class Counsel researched the evolving case law interpreting Charter's principal defenses, including the Employee Commuting Flexibility Act and the Motor Carrier Act.  (Id. ¶ 56).

Class Counsel's obligations to the class members will continue into the future. (Id. ¶ 57).  This will include the need to assist, as appropriate, with settlement administration as well as participation in the final approval hearing.  (Id.).  Additional fees will be incurred relating to contacts with opt-in class members regarding the settlement.  (Id. ¶ 33).  Additionally, Class Counsel is required, pursuant to the terms of the Settlement Agreement, to respond to objections by class members to the settlement. (Id. ¶ 58).  Assuming that the Settlement Agreement receives preliminary approval, Class Counsel's obligations will continue during the claims process, through the final approval hearing and for several months thereafter dealing with questions and concerns of the class members.

### B.      Exceptional Results.

The Settlement Agreement creates an $18,000,000.00 common fund.   Class Counsel makes a request for $5,400,000 in costs and attorneys' fees.   After deducting Class Counsel's costs and attorneys' fees, one-half ($45,000) of the settlement administrative expenses in the total amount of $90,000, and class representative enhancement payments of $75,000, approximately $12.5 million will be available for distribution to class members.   The amount owed to each class claimant depends upon the number of weeks in which the individual was employed by Charter in a covered position during the time period covered by the Settlement Agreement, subject to a maximum of 156 weeks.   The average cash recovery per class member, prior to applicable withholding, is nearly $3,500.[4]   This is an excellent result given the substantial risks that accompanied this complicated and time-consuming litigation.

### ARGUMENT

### I.      CLASS COUNSEL'S REQUEST FOR ATTORNEYS' FEES IS CONSISTENT WITH THE REASONABLE MARKET RATE GIVEN THE SIGNIFICANT RISKS OF THIS LITIGATION, AND THE EXCEPTIONAL RESULTS OBTAINED FOR THE CLASS MEMBERS.

### A.      Plaintiffs Are Entitled to Attorneys' Fees and Costs.

Plaintiffs are entitled to fees in this lawsuit, which was brought as a Rule 23 class action pursuant to the wage and hour laws of California, Michigan, Minnesota, Missouri, Nevada, Illinois, Nebraska, Oregon and Washington, and includes a claim under Section 216(b) of the Fair Labor Standards Act.   The purpose of Section 216(b) of the FLSA is to

---

[4]  This number is based on a non-final list provided by Charter's counsel.  Plaintiffs anticipate that the average recovery per class member will increase once Charter provides a final list.

ensure "effective access to the judicial process by providing attorneys fees for prevailing plaintiffs with wage and hour grievances." Roofers Local 317 v. G & M Roofing & Sheet Metal Co., 732 F.2d 495, 502 (6th Cir. 1984). "Congress intended that the wronged employee should receive his full wages . . . without incurring any expense for legal fees or costs." Id. Consistent with these policies, in an action under the FLSA, the district court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). Similarly, attorneys' fees and costs are recoverable under the state wage and hour statutes at issue in this litigation. See Cal. Lab. Code § 1194; Mich. Comp. Laws § 408.393 sec. 13(1)(a); Minn. Stat. § 181.171(3); Mo. Rev. Stat. § 290.527; Nev. Rev. Stat. § 608.140; 820 ILCS § 105/12(a); Neb. Rev. Stat. § 48-1206(5); Or. Rev. Stat. § 653.055(4); Wash. Rev. Code § 49.46.090.

Plaintiffs are the prevailing party in this litigation, and they are entitled to an award of attorneys' fees. A plaintiff "prevails" when "actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Farrar v. Hobby, 506 U.S. 103, 111-112 (1992). This relief may come in the form of an enforceable judgment, a consent decree, or a settlement. Id.; see also Rule 23(h), Fed. R. Civ. P. ("In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement."). Here, Plaintiffs have secured substantial relief, as evidenced by the terms of the proposed Settlement Agreement. Accordingly, Plaintiffs are the prevailing party and are entitled to an award of attorneys' fees and costs under the FLSA and applicable state law.

**B.    Class Counsel's Request for Fees Is Reasonable.**

This court has broad discretion in deciding whether a requested fee is reasonable in the class action context.   7B Alan Wright et al., <u>Federal Practice and Procedure: Federal Rules of Civil Procedure</u>, § 1803.1 (3d ed & 2008 Supp.).   In the Seventh Circuit, "common fund principles properly control a case which is initiated under a statute with a fee-shifting provision, but is settled with the creation of a common fund."   <u>Florin v. Nationsbank of Georgia</u>, 34 F.3d 560, 564 (7th Cir. 1994) ("<u>Florin I</u>").   In fact, "when a case results in the creation of a common fund for the benefit of the plaintiff class, the common fund doctrine allows plaintiffs' attorneys to petition the court to recover its fees out of the fund."   <u>Florin I</u> at 43 F.3d at 563.   The court then determines the amount of attorney' fees that plaintiff's counsel may recover from this fund.   <u>Id.</u>   The common fund doctrine is based on the notion that "all those who have benefitted from the litigation should share its costs.'"   <u>Florin I</u> at 43 F.3d at 563 (citation omitted)

The Seventh Circuit uses a "market-based approach" to set the percentage of the total settlement, from the common fund, to be awarded as reasonable attorney's fees. Under this approach, the district court "is required to estimate the terms of a contract [that] private plaintiffs would have negotiated with the attorneys at the outset of the case, with reference to benchmarks, such as the actual agreements between the class members and their attorneys, data from other suits, and auctions for legal services." 7B Alan Wright et al., <u>Federal Practice and Procedure:  Federal Rules of Civil Procedure</u>, § 1803.1 (3d ed & 2008 Supp.).   In applying this framework, "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being

14

paid by court order."  Steinlauf v. Continental Illinois Corp., 962 F.2d 566, 568 (7th Cir. 1992).  The "touchstone of the analysis" is what paying clients would have compensated the attorneys in an open market for legal services: "The object in awarding a reasonable attorney's fee, as we have been at pains to stress, is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." Steinlauf at 962 F.2d at 572.  Ultimately, "Class Counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client."  Steinlauf at 962 F.2d at 572-73 (noting that "in personal injury suits the usual range for contingent fees is between 33 and 50 percent . . .").  This can be proven through "testimony or statistics concerning the fee arrangements in commercial litigation comparable to the present suit."  Id.

The Seventh Circuit Court of Appeals emphasized the necessity of determining the market rate for attorney fees in class-action common-fund cases in In re Synthroid Marketing Litigation, 264 F.3d 712 (7th Cir. 2001) (Synthroid I).  Synthroid I was a class action suit brought by consumers and health insurers against a pharmaceutical company asserting various claims relating to misrepresentations the manufacturer made about the drug.  The defendant agreed to pay the consumer class $88 million and $46 million to the insurer class.  The district court approved the settlement but awarded fees "at a level significantly below what the lawyers had requested."  Id. at 715.  The district court reasoned that the large settlement created a "megafund" and that each class' attorneys was entitled only to 10% of the settlement.  Id. at 717.

The Seventh Circuit reversed.  "We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award Counsel

the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." Id. at 718 (emphasis added)(citations omitted). Ultimately, "[t]he market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." Id. at 721. The fee award must be made with "reference to arrangements that satisfy willing buyers and sellers rather than the compensation that a judge thinks appropriate as a matter of first principle." In re Synthroid Marketing Litigation, 325 F.3d 974, 976 (7th Cir. 2003) (Synthroid II). In applying this standard, the judge is *not* required to "monitor how many hours the lawyers prudently devoted to the case. The client cares about the outcome alone." In re Synthroid at 325 F.3d at 979-980.

Four years later, the Seventh Circuit re-affirmed its commitment to the market analysis for awarding attorney fees in Taubenfeld v. AON Corporation, 415 F.3d 597 (7th Cir. 2005). There, a single class member objected to a settlement agreement in a securities fraud class action lawsuit, which awarded plaintiffs' Counsel 33.3% of the total settlement as attorney's fees. Id. at 415 F.3d at 598. The class member argued that the district court relied solely on the "benchmarks" set forth in the Synthroid cases and failed to consider case specific factors, such as the risk involved and amount of recovery. Id. at 415 F.3d at 599. The Seventh Circuit Court of Appeals affirmed the district court because the objecting class member failed to articulate why the fee award was not an accurate reflection of the market rate for attorney fees in this type of litigation. Id. at 415 F.3d at 599 (citations omitted). The court concluded that the district court properly applied the market rate standard when approving the settlement agreement and fee award.

16

"[L]ead Counsel's memorandum to the district court in support of its application for fees and expenses contained an analysis of the strength of the class' case, data on fees awarded in other class actions in the jurisdiction, and evidence of the quality of legal services rendered—the same type of evidence needed to mimic the market per Synthroid." Id. at 415 F.3d at 600.

Recently, the Seventh Circuit rejected a district court fee award that gave undue weight to the degree of success "without factoring the value that the market would have placed on Counsel's legal services had its fee been arranged at the outset." Sutton v. Bernard, 504 F.3d 688, 694 (7th Cir. 2007).  The court again emphasized that "[i]n deciding fee levels in common fund cases, we have consistently directed district courts to do their best to award Counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" Id. at 504 F.3d at 692 (quoting Synthroid I, 264 F.3d at 718).  Furthermore, the district court erred in refusing to consider the risk of nonpayment faced by plaintiffs' counsel:

> We have said that the market price for legal fees "depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case."

Id. at 693 (citation omitted).

In Continental Securities Litigation v. Continental Illinois Corp., 962 F.2d 566 (7th Cir. 1992), the Seventh Circuit criticized the loadstar method and recommended the percentage method in an action involving a class counsel fee request.  The court observed:

> The judicial task might be simplified if the judge and the lawyers bent their efforts on finding out what the market pays not for individual hours

17

> but for the ensemble of services rendered in a case of this character . . .
> The class counsel are entitled to the fee they would have received had they
> handled a similar suit on a contingent fee basis with a similar outcome, for
> a paying client.

Continental Securities, 962 F.2d at 572.

The United States District Court for the Eastern District of Wisconsin recently followed the Seventh Circuit's market-based approach in McKinnie v. JP Morgan Chase Bank, N.A., 2009 WL 5217673 (E.D. Wis. Dec. 31, 2009). In McKinnie, class counsel sought an award of fees and expenses in an amount which equaled approximately 30% of the $2.1 common fund. Id. *8. In analyzing this request, the court observed that "an appropriate attorneys' fees award is one that 're-creates' the market for the provided legal services." Id. at *7 (citing Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 408 (7th Cir. 2000)). The court held that class counsel's request was reasonable because it fell within the normal percentage range of common-fund attorneys' fees awards approved by courts. Id. *8. Citing Continental Securities, infra, the court concluded that the fee request was appropriate because class counsel were "entitled to the fee that they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." Id. *8 (citing Continental Securities, 962 F.2d at 572).

As these decisions indicate, the market-method for determining attorney fees should apply in all class action settlements involving a common fund, even when fees are awarded pursuant to a fee-shifting statute. See People Who Care v. Rockford Bd. of Educ., School Dist., 272 F.3d 936, 938 (7th Cir. 2001) (characterizing its "'market mimicking' approach" as "orthodox in the circuit, [for] computing the fee award."). While the court will give significant weight to the contingency percentage set forth in a

fee agreement between the parties and Class Counsel, counsel should be prepared to submit evidence relating to the percentage fees awarded in like cases, and other evidence demonstrating the percentage set forth in the fee agreement is consistent with the market rate for legal services in similar cases.  See Id.

"Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery." 4 Newberg and Conte, *Newberg on Class Actions* § 14.6 (4th ed. 2007).  In addition, according to a Federal Judicial Center study of more than 600 class actions released in 2005, an award of 29% for attorneys' fees and costs was "typical".  Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation* 52 (2005).  These studies are confirmed by fee awards in similar, nationwide class action employment lawsuits, including those brought pursuant to 29 U.S.C. § 216(b).  *See* Lenahan v. Sears, Roebuck and Co., 2006 WL 2085282 at * 21 (D.N.J. 2006) (noting that 30% of common fund is regularly awarded in labor and employment class action litigation); Frank v. Eastman Kodak Co., 228 F.R.D. 174, 188 (W.D. N.Y. 2005) (awarding 38.26% of total settlement in common fund case under FLSA); Lepinske v. Mercedes Homes, Inc., 2008 WL 2694111 at *4 (M.D. Fla. 2008) (approving award of 33.33% of common fund settlement in FLSA case, pending objections); Gilliam v. Addicts Rehabilitation Center Fund, 2008 WL 782596 at *6 (S.D.N.Y. 2008) (33.33% award "consistent with norms of class litigation"); Romero v. Producers Dairy Foods, 2007 WL 3492841 (E.D. Cal. 2007) (accord); Camp v. Progressive Corp. 2004 WL 2149079 at *22 (E.D. La. 2004) (awarding 29.62% of

common fund in FLSA class action); <u>Kidrick v. ABC Television & Appliance Rental</u>, 1999 WL 1027050 at *1 (N.D. W. Va. 1999) (awarding 30.6%).

In the instant case, Class Counsel seek an award of attorneys' fees and costs that is consistent with what a willing client would agree to pay an attorney to take this type of case at the inception of the representation.  Specifically, Class Counsel seeks an award of fees and costs that represents thirty percent (30%) of the $18 million common fund, for a total of $5,400,000.  This request is supported by the underlying fee agreements, in which Plaintiffs agreed to pay Class Counsel thirty percent (30%) of the total amount of any recovery, plus actual costs.  As clearly set forth in the accompanying Declarations of Attorneys Aaron N. Halstead, William E. Parsons, Michael R. Fox, and Jay A. Urban, this percentage is consistent with the market rate for legal services in similar, complex litigation in the Dane County Wisconsin area.

There are other compelling factors that support the relief requested in this petition.  This case yielded an exceptional result for class members, who will recover nearly $3,500.  More importantly, this result followed in the face of substantial risk.  By definition, complex nationwide class-action litigation is a risky venture.  *See* <u>White v. Sundstran Corp.</u>, 256 F.3d 580, 586 (7th Cir. 2001)(" . . . attorneys already supply risk-bearing services in class actions.  They invest legal time on contingent fee, taking the risk of failure in exchange for a premium award if the class prevails.").  Many cases are decided (and dismissed) at the certification (or decertification) stage given the exacting standard of proof presented by Rule 23 and 29 U.S.C. § 216(b). *See* <u>Mooney v. Aramco Services Co.</u>, 54 F.3d 1207, 1214 (5th Cir. 1995); <u>In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions</u>, 148 F.2d 283, 283, 321 (3d Cir. 1998)(noting inherent

risk of decertification in class action litigation).  Setting aside the attorney manpower involved, the cost of litigating a lawsuit of this magnitude is substantial, as evidenced by the fact that Class Counsel has incurred approximately $122,000 in costs to date.  All of these risks (and costs) were incurred in the face of the distinct possibility that this lawsuit might not succeed.  This high-risk factor also justifies the percentage of recovery sought in this petition.

Counsel's risk in pursuing this litigation was magnified by the fact that Charter threatened to, and ultimately did, declare bankruptcy while this case was pending.  In this respect, the Seventh Circuit has clearly stated that the risk of non-payment must be considered in evaluating the reasonableness of a fee petition in a common fund case.  Sutton, 504 F.3d at 693-94.  In Sutton, the district court dismissed class counsel's argument that the risk of non-payment helped justify a request for 28% in fees, and instead awarded class counsel a 15% fee award.  Id. at 690-92.  The Court of Appeals reversed, concluding that the district court abused its discretion in failing to consider this critical factor.  Id.  Quoting Synthroid I, the Court of Appeals stated, "[i]n deciding fee levels in common fund cases, we have consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" Sutton, 504 F.3d at 692 (quoting In re Synthroid Mktg. Litig., 264 F.3d 712, 718 (7th Cir. 2001)); see also Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 199 (3d Cir. 2000) (district court abused its discretion in setting fee award by failing to adequately consider fact that defendants posed an insolvency risk).

21

The risk of Charter's insolvency is a critical factor in this case, not only because it is a factor that must be considered in evaluating the fee petition, but because it drove much of class counsel's litigation efforts.   Class Counsel knew that Charter was considering bankruptcy before filing this lawsuit.   After Charter declared bankruptcy, Class Counsel vigorously protected the class members' interests in the bankruptcy proceeding.   Class Counsel filed substantial motions requesting that the bankruptcy court certify the Plaintiff classes pursuant to Rule 7023 of the Federal Rules of Bankruptcy Procedure, and to estimate the value of Plaintiffs' class claims.   These motions were designed to protect the class members' claims if they had been liquidated as part of Charter's reorganization plan.   In addition, Class Counsel secured a stipulation from Charter's bankruptcy counsel permitting Plaintiffs to pursue their claims in the United States District Court for the Western District of Wisconsin following confirmation of Charter's Chapter 11 reorganization plan.

Finally, the requested fees are reasonable because of Class Counsel's expertise in complex federal court litigation and the substantial time spent working on this case. As fully explained in the accompanying Declarations, Class Counsel spent more than 4,800 hours working on this case.   Class Counsel has exhaustively researched the substantive law, investigated claims, reviewed documents, prepared pleadings, drafted and responded to motions, and drafted all of the appropriate claim and notice forms necessary to carry out the settlement.   These related activities, driven by competent federal court practitioners, have led to exceptional results in an exceptionally risky case.

The fact that this case settled prior to certification does not change the analysis. Commentators have noted that "one purpose of the percentage method" of awarding fees

"is to encourage early settlements by not penalizing efficient counsel . . ."  3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 1403, at 14-3 to 14-7 (3d ed. 1992). For this reason, "[p]rocuring a settlement, in and of itself, is *never* a factor that the district court should rely upon to reduce a fee award.  To utilize such a factor would penalize efficient counsel, encourage costly litigation and potentially discourage able lawyers from taking such cases."  Gunter v. Ridgewood Energy Co., 223 F.3d 190, 198 (3d Cir. 2000)(emphasis supplied).

In summary, the market rate for representation of similar litigation, at the "front end," is exactly what Class Counsel bargained for in the instant case.  This result is consistent with the exceptional results achieved for the class members, along with the substantial risk that Class Counsel faced as it worked towards that result.  This result is also consistent with similar fee awards in other wage and overtime cases throughout the country, along with the standard fee in the prevailing market.  For these reasons, Class Counsel would respectfully request that this Court enter an appropriate order awarding Class Counsel thirty percent (30%) of the common fund, or $5,400,000, as a reasonable award of attorneys' fees and costs.

### C.   Class Counsel's Request for Costs Is Reasonable.

In addition to attorneys' fees, Class Counsel is entitled to reimbursement of its costs pursuant to 29 U.S.C. § 216(b) and applicable state law.  *See* Cal. Lab. Code § 1194; Mich. Comp. Laws § 408.393 sec. 13(1)(a); Minn. Stat. § 181.171(3); Mo. Rev. Stat. § 290.527; Nev. Rev. Stat. § 608.140; 820 ILCS § 105/12(a); Neb. Rev. Stat. § 48-1206(5); Or. Rev. Stat. § 653.055(4); Wash. Rev. Code § 49.46.090.  Plaintiffs have incurred costs to date in the amount of approximately $122,000, and will incur additional

costs in administering the distribution of settlement proceeds.  These costs, which include the costs incurred through the preparation of Dr. Lewin's report, were necessary to protect and advance the interests of class members.  As stated above, under the terms of the fee agreements, Class Counsel are entitled to request attorneys' fees of 30% *plus actual costs*.  Instead of requesting a separate award of actual costs, however, Class Counsel ask that their costs be absorbed into the combined 30% fees and costs request. Accordingly, Class Counsel's combined request of fees and costs will not exceed 30% of the common settlement fund.  The Court should accordingly award Class Counsel these reasonable and necessary costs.

## **CONCLUSION**

On the basis of the argument and authority set forth above, the supporting declarations and the record in this matter, Plaintiffs respectfully request that this Court award those costs and attorneys' fees requested in Plaintiffs' Petition for Class Counsel's Costs and Attorneys' Fees.

Respectfully submitted this 18th day of May, 2010.

GINGRAS, CATES & LUEBKE, S.C.                    AXLEY BRYNELSON, LLP

/s/_____                     /s/ Michael J. Modl_____

Robert J. Gingras                                Michael J. Modl
Michael J. Luebke                                John C. Mitby
8150 Excelsior Drive                             Steven S. Streck
Attorneys for Plaintiff                          Timothy D. Edwards
8150 Excelsior Drive                             Attorneys for Plaintiff
Madison, Wisconsin   53701-1808                  2 E. Mifflin St., Ste. 200
(608) 833-2632                                   Madison, WI   53703
gingras@gcllawyers.com                           608-257-5661
luebke@gcllawyers.com                            mmodl@axley.com
                                                 jmitby@axley.com
                                                 sstreck@axley.com
                                                 tedwards@axley.com