UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARC GOODELL,
PHILIP POWERS,
CHAD WERTH,
ROSS BLAKLEY,
DOMINICK P. TUCKER,
JUSTIN ROSE, and
KYLE CRAWFORD,
on behalf of themselves and a class
of employees and/or former employees
similarly situated,

    Plaintiffs,

                                    Case No. 08-cv-512-C

v.

CHARTER COMMUNICATIONS, LLC,
and
CHARTER COMMUNICATIONS, INC.

    Defendants.

---

**DECLARATION OF MICHAEL J. MODL IN SUPPORT OF
PETITION FOR CLASS COUNSELS' COSTS AND ATTORNEYS' FEES**

---

STATE OF WISCONSIN    )
                                ) ss
COUNTY OF DANE        )

       I, Michael J. Modl, certify under penalty of perjury that the following is true and correct to the best of my knowledge and recollection:

       1.    I am an adult resident of the State of Wisconsin.

       2.    I make this declaration in support of the Petition for Class Counsels' Costs and Attorneys' Fees in the above-captioned matter.

3. I am an attorney duly authorized to practice law in the State of Wisconsin and am admitted to practice in the United States District Court for the Western District of Wisconsin.

4. I am a partner at the law firm of Axley Brynelson, LLP ("Axley") in Madison, Wisconsin and I am one of the attorneys retained to represent Plaintiffs in the present action.

5. Axley was retained as co-Class Counsel with the law firm of Gingras, Cates & Luebke, S.C. ("Gingras") to represent Plaintiffs and the putative class members in this matter.

6. Each of the Plaintiffs, on behalf of himself and the putative class members has executed a fee agreement retaining Axley and Gingras as Class Counsel.

7. Pursuant to the terms of the fee agreements, Plaintiffs Marc Goodell, Philip Powers, Chad Werth, Ross Blakley, and Dominick P. Tucker agreed to a payment of 30% of the gross settlement amount to Class Counsel, in the event this matter was resolved through settlement.

8. Pursuant to the terms of the fee agreements, Plaintiffs Justin Rose and Kyle Crawford agreed to a payment of 33.3% of the gross settlement amount to Class Counsel, in the event this matter was resolved through settlement.

9. Pursuant to the fee agreements, Class Counsel agreed to assume the risk for all actual costs in the litigation in the event Plaintiffs were unsuccessful.

10. Under the terms of the fee agreements, Class Counsel is entitled to request attorneys' fees of at least 30%, plus actual costs.

11. Instead of requesting a separate award of actual costs, however, Class Counsel request that their costs be absorbed into a combined 30% fees and costs request.

12. This request actually decreases Class Counsel's fee request to approximately 29.3% of the common fund.

13. Your declarant and Attorney Robert J. Gingras have served as co-lead counsel in this lawsuit on behalf of the Plaintiff classes and have directed the efforts of attorneys and other legal professionals at our respective firms.

14. Attorney John Mitby oversaw a number of critical issues in the case, including mediation, settlement discussions, and overall strategy.

15. In prosecuting this case, attorneys and legal professionals at Axley have reasonably and necessarily performed 2,890 hours of legal work related to this litigation.

16. I have supervised the work performed by the attorneys and other legal professionals at Axley and confirm that the time expended was reasonable and necessary for the successful litigation of this matter.

17. As early as July of 2008, Class Counsel was aware that Charter posed a significant bankruptcy risk.

18. For this reason, Class Counsel insisted that Charter provide a letter of credit as a condition of settling a related class action against Charter, Sjoblom v. Charter Communications, LLC, et al. (W.D. Wis. Case No. 3:07-cv-00451-bbc).

19. The purpose of the letter of credit was to ensure that in the event that Charter filed a bankruptcy petition, settlement proceeds in the Sjoblom matter would be funded by JP Morgan Chase Bank, N.A., a third-party creditor.

20. Class Counsel believed that a letter of credit was necessary after reading a series of articles in media sources which described Charter's deteriorating financial condition.

21. On March 27, 2009, Charter filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York.

22. Throughout Charter's bankruptcy, Class Counsel continued to aggressively represent the interests of Plaintiffs and the putative classes. Most notably, on May 28, 2009, Class Counsel filed a Motion for Class Certification and For Class Treatment of Plaintiffs' Proof of Claim, as well as a Motion for Estimation of Plaintiffs' Class Claim.

23. By filing these motions, Class Counsel requested that the bankruptcy court certify the Plaintiff classes pursuant to Rule 7023 of the Federal Rules of Bankruptcy Procedure, and to estimate the value of Plaintiffs' class claims.

24. The purpose of these motions was to protect the class members if their claims were liquidated pursuant to Charter's reorganization plan.

25. On June 2, 2009, the bankruptcy court held a telephonic hearing at the request of Charter's bankruptcy counsel to address Plaintiffs' class certification and estimation motions.

26. During this hearing, Charter's bankruptcy counsel argued that the bankruptcy court should not certify the Plaintiff classes because the class members' claims would pass through the bankruptcy and be litigated in the present forum following the confirmation of Charter's plan of reorganization.

27. The bankruptcy court then requested that the parties negotiate and execute a stipulation permitting Plaintiffs to pursue their claims in the United States District Court for the Western District of Wisconsin following confirmation.

28. The bankruptcy court entered the stipulated order in late June, 2009.

29. On November 17, 2009, the bankruptcy court confirmed Charter's Chapter 11 plan of organization.

30. On December 8-9, 2009, the parties met in Boston for an initial two-day mediation session.

31. On March 16, 2010, the parties met for a second, lengthy mediation session in Utah. At the conclusion of this session, Class Counsel and counsel for Charter executed a Memorandum of Understanding memorializing the basic terms of this settlement. The Gingras and Axley firms did not seek any agreement from Charter with respect to attorneys' fees or even request that Charter stipulate to any particular amount of attorneys' fees that the firms would request from the Court. The sole goal of Class Counsel in effectuating the settlement was to procure the best settlement result for the class members. We understand that it is up to the Court to set the attorneys' fee award in accordance with the market rate.

32. After the parties executed the Memorandum of Understanding, the parties engaged in extensive negotiations regarding the terms of the settlement agreement and continued to negotiate unresolved issues bearing upon settlement.

33. As of April 30, 2010, Class Counsel and legal professionals associated with Class Counsel have devoted more than 4,800 hours on behalf of the Plaintiff classes and have incurred approximately $122,000 in actual costs. I reasonably anticipate that

5

Class Counsel will incur an additional $3,000 in costs administering the settlement and addressing class members' questions regarding the settlement. Class Counsel has retained a third-party claims administrator, Rust Consulting, Inc. ("Rust"), to help administer the settlement. Rust's services will cost $90,000, half of which ($45,000), will be deducted from the common fund.

34. Class Counsel's legal services have included detailed investigations of potential claims against Charter. This has included in-person and telephonic conferences with Plaintiffs and numerous putative class members.

35. Class Counsel contacted numerous class members to investigate the issues in the case, including non-payment for loading and unloading and the time spent working off-the-clock and during scheduled lunch breaks.

36. Class Counsel engaged in numerous phone interviews with putative class members and traveled to meetings with class members.

37. Class Counsel also spent substantial time and effort researching and responding to motions filed by Charter. These included a Motion to Transfer to the Eastern District of Michigan (Dckt. #10), as well as a second Motion to Transfer, which included a request that the Court sever Plaintiffs' claims into four separate actions (Dckt. #41).

38. Class Counsel also spent significant time and resources to establish that the Plaintiff classes were suitable for class certification. Specifically, Class Counsel conducted extensive telephone interviews with dozens of class members to determine the amount of time that they spent engaged in the uncompensated work activities at issue in this case.

39. The results of this survey were shared with Class Counsel's class-certification expert, Dr. David Lewin.

40. Dr. Lewin then utilized this data in an expert report which accompanied Plaintiffs' Motion for Class Certification and For Class Treatment of Plaintiffs' Proof of Claim, and Motion for Estimation of Plaintiffs' Class Claim.

41. Dr. Lewin's report concluded that class certification was appropriate due to Charter's highly centralized management structure and the standardization of its payroll practices.

42. Dr. Lewin also estimated the amount of damages due to Plaintiffs.

43. If this case had proceeded to briefing on the merits of class certification, Class Counsel would have relied upon an updated version of Dr. Lewin's report to establish the prerequisites for certification.

44. Plaintiffs incurred more than $50,000 in costs in retaining Dr. Lewin's services.

45. Class Counsel performed significant work to protect the interests of class members during Charter's bankruptcy. In addition to drafting the certification and estimation motions described above, Class Counsel attended two hearings at the United States Bankruptcy Court for the Southern District of New York which concerned the treatment of creditors' claims.

46. Class Counsel also drafted an objection to Charter's bankruptcy disclosure statement.

7

47. Class Counsel regularly reviewed bankruptcy filings to determine their impact on the class members' claims, and engaged in numerous telephonic conferences with Charter's bankruptcy counsel regarding the treatment of class members' claims.

48. Class Counsel also devoted time and effort related to written discovery in this matter, preparing an extensive set of discovery requests in November, 2008.

49. Class Counsel spent many hours engaged in meet-and-confer sessions with counsel for Charter regarding the scope of Charter's discovery obligations.

50. Class Counsel also consulted with Plaintiffs' E-discovery expert on numerous occasions regarding efforts to obtain E-discovery from Charter.

51. Through the duration of this case, Class Counsel met on nearly a weekly basis.

52. Class Counsel discussed the status of pending matters and analyzed strategies to move the case forward.

53. Lead counsel delegated appropriate tasks to the various team members.

54. With the magnitude of this litigation, it was imperative that there be regular communication between everyone on Class Counsel's litigation team.

55. Class Counsel's efforts also involved significant research into the state wage-and-hour laws at issue in this litigation.

56. In addition, Class Counsel researched the evolving case law interpreting Charter's principal defenses, including the Employee Commuting Flexibility Act and the Motor Carrier Act.

57. Class Counsel's obligations will continue into the future. This will include the need to assist, as appropriate, with settlement administration as well as participation in the final approval hearing.

58. Additionally, Class Counsel is required, pursuant to the terms of the Settlement Agreement, to respond to objections by class members to the settlement.

59. I am familiar with complex litigation including employment litigation and class action litigation.

60. I am familiar with wage and hour law and know that there were a number of potential defenses to the claims asserted in this action including the Employee Commuting Flexibility Act and the Motor Carriers Act. I am aware that had Charter been successful on one or more of these defenses, recovery for the class could have been reduced significantly.

61. I am aware that class certification of both a national FLSA class and state-law classes asserting wage and hour violations under Rule 23, Federal Rules of Civil Procedure, has its own set of hurdles and that a failure to certify or a motion granting decertification is a significant risk in federal and state wage and hour litigation.

62. It became apparent from early on in this litigation that Charter intended to aggressively defend against the Plaintiff's claims. This defense increased the amount of attorney time needed to successfully pursue Plaintiff's claims.

63. The firms of Axley and Gingras took substantial risks of non-recovery of both costs and fees in pursuing this case on behalf of the Plaintiff classes. Prior to the filing of the Complaint, the Axley and Gingras firms were concerned that Charter's risk of bankruptcy substantially magnified the risk of non-recovery. In fact, both firms gave

9

due consideration as to whether or not the case should even be pursued given the significant financial risk associated with the possibility of a Charter bankruptcy.

64. Based upon my experience as an attorney who has been practicing law in Madison, Wisconsin for over 20 years, including litigating employment and other class action lawsuits, a 30% contingent fee is consistent with the market rate given the risks involved in this type of litigation, and particularly under the circumstances that were presented in this case.

Dated May 14th, 2010.

/s/ Michael J. Modl
Michael J. Modl